IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IMG WORLDWIDE, INC., *et al.*,           )          CASE NO.  1:11 CV 1594
                                         )
       Plaintiffs,                      )
                                         )
v.                                       )          JUDGE DONALD C. NUGENT
                                         )
WESTCHESTER FIRE INSURANCE               )
COMPANY,                                 )          MEMORANDUM OPINION
                                         )          AND ORDER
       Defendant.                       )



      This matter is before the Court on the parties' post-trial motions.  The following motions

are currently pending and will be addressed in this Opinion: (1) Defendant's Motion for Directed

Verdict and Judgment as a Matter of Law (ECF #120, 121)(Response at ECF #140; Reply at

ECF #144); (2) Plaintiff's Motion for Award of Prejudgment Interest (ECF #117)(Response at

ECF  #133; Reply at ECF #142); (3) Plaintiff's Motion for Judgment in Favor of IMG on

Westchester's Duty to Defend (ECF #116)(Response at ECF # 132, 135; Reply at ECF # 141);

(4) Defendant's Motion for Leave to File Third-Party Complaint Against Great Divide (ECF

#112)(Responses at ECF #130, 147. 150; Reply at ECF # 138); and, (5) Defendant's Motion for

Declaratory Judgment with Respect to Reimbursement from Great Divide or in the Alternative a Set-off Based on the Settlement Agreement Between Great Divide and IMG (ECF #136)(Response at ECF #145; Reply at ECF #149). The Court heard oral arguments on each of these matters on April 11, 2013. The issues have now been fully briefed and argued, and are ready for disposition.

### Procedural and Factual History

This case was brought to determine whether the Defendant, Westchester Fire Insurance Company ("Westchester") is obligated to pay the Plaintiffs, IMG Worldwide, Inc. and IMG Academies, LLP (collectively "IMG") for reimbursement of a settlement payment they made, and defense costs they incurred, in connection with the lawsuit *Gastaldi, et al v. Sunvest Communities USA, LLC, et al.,* Case No. 08-62076-CIV (S.D. Fla., Miami 2009)("the *Gastaldi* suit"). Defendant, Westchester is an excess insurance provider. Westchester and IMG entered into four separate year long Commercial Umbrella Liability Policies beginning on August 10 of 2005 and running through August 10 of 2009. The parties have not agreed on which policy or policies apply to the claims raised in the *Gastaldi* litigation, although they both agree that at least one policy would have been in effect during the relevant time period.[1]

---

[1]

At trial evidence was presented as to the existence of all four policies, and there was agreement that one of the policies covered the claims at issue. However, there was no evidence that the language relating to indemnity differed in any significant manner between the policies. As such, neither the parties nor the jury were required to pinpoint a policy in order to determine Westchester's liability for indemnification. The duty to defend language in the 2005/2006 and 2006-2007 policies is substantively different than the language contained in the 2007-2008 and 2008-2009 policies, however, and the Court will have to determine which policy applies in order to determine the defense issue.

The *Gastaldi* lawsuit stemmed from allegations that Sunvest and a co-developer, Cay Clubs International sold the Plaintiffs undeveloped properties with the promise that they would be upgraded and developed into high end condominiums. IMG allegedly made representations that it was in partnership with these developers and promised to build an IMG sports center in the development once it was built. IMG did not have any contractual obligation to actually develop the condominiums or the development property. Nonetheless, the *Gastaldi* court found that IMG could potentially be liable for some form of damages because it allegedly misrepresented its relationship with the developers in advertising and marketing materials in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

The *Gastaldi* Plaintiffs originally sued IMG, Sunvest Communities USA, LLC and Sunvest Development, LLC (the *Gastaldi* developers) for fraud, conversion, civil theft, and violations of FDUTPA.. (ECF #1-1). The fraud, conversion, and theft claims were dismissed prior to the summary judgment stage and a Second Amended Complaint was filed alleging only the FDUTPA claim(s). Once the lawsuit was filed, IMG sought coverage from its primary carrier, Great Divide Insurance Company ("Great Divide"), and from its excess carrier, Westchester Fire Insurance Company ("Westchester") for defense and indemnity from any judgment. Both carriers denied coverage and refused to provide a defense for IMG. Prior to trial, IMG settled the *Gastaldi* case for nearly five million dollars ($5,000,000.00), after having incurred defense costs of over eight million dollars ($8,000,000.00).[2] Following the *Gastaldi* settlement, IMG continued to seek coverage for indemnity of the settlement amount, and the cost of defense from both carriers.

---

[2]

Westchester does not contest the reasonableness of the defense costs.

IMG's primary insurer, Great Divide, originally denied coverage.  However, after the settlement of the underlying case, and following a protracted period of negotiations, it agreed to pay the policy limits under its 2005-2006 policy.  Great Divide also agreed to pay two hundred and fifty thousand dollars ($250,000.00) toward IMG's defense costs.   (ECF #146-2).   In exchange, IMG released Great Divide from any further liability under any and all Great Divide policies for any matters relating to the *Gastaldi* matter, including indemnity and defense costs. (ECF #146-2).   Westchester continued to deny coverage, and this lawsuit followed, culminating in a jury trial on the question of coverage.

At trial IMG presented evidence supporting its position that the *Gastaldi* settlement resolved any liability IMG may have had for damages suffered by the *Gastaldi* Plaintiffs due to "property damage" resulting from a "loss of use" of the properties they had purchased.  IMG also argued that the loss of use of the properties was caused by an "occurrence" as defined in the Westchester policies.  IMG argued throughout the trial, and again at oral argument on the post-trial motions, that the alleged "occurrence"  was a downturn in the economy leading to the developers' abandonment of the project.  Westchester, on the other hand, argued that the damages sought by the *Gastaldi* Plaintiffs were not "property damage" as that term was defined by the policies, but rather a "loss on investment," which was not covered under the policies. Westchester also argued that the only possible "occurrence" that could have led to damages attributable to IMG in this case, was the alleged misrepresentation(s) made by IMG in violation of the FDUTPA laws.  As such, Westchester took the position that there was no insurable "occurrence" because under the policy language and relevant Ohio insurance law, a misrepresentation cannot be an "accident." In turn, if there is no accident, there cannot be an

-4-

"occurrence" that triggers coverage under the Westchester policies.   Based on the relevant Ohio law, and the arguments of the parties, the Court included a jury instruction at trial informing the jury that a misrepresentation could not be an "occurrence" under the policy.

Following deliberations, the jury found: (1) that IMG had proven by a preponderance of the evidence that Westchester breached its contract with IMG by not paying on the policy; (2) that IMG proved by a preponderance of the evidence that there was an "occurrence;" (3) that there was "property damage;" and, (4) that Westchester had not proven by the requisite burden of proof that the "expected or intended injury" exclusion applied.  (ECF #110, 111).  Therefore, the jury returned a verdict in favor of IMG, finding that Westchester was responsible for indemnification of the *Gastaldi* settlement in the amount of three million, nine hundred thousand dollars ($3,900,000.00).[3]  (ECF #111).   The Court retained the question of whether Westchester is also liable for reimbursement of IMG's defense costs over and above the two hundred and fifty thousand dollars ($250,000.00) contributed by Great Divide in its settlement with IMG.

## ANALYSIS

### I. Directed Verdict / JNOV

Defendant Westchester now seeks to overturn the jury's finding of liability for indemnification and has moved the Court for a directed verdict and for judgment as a matter of

---

[3]

This amount equals the cost of the *Gastaldi* settlement amount minus the one million dollars ($1,000,000.00) paid by Great Divide pursuant to their settlement agreement with IMG, and a two hundered and fifty thousand dollar ($250,000.00) deductible IMG owed under the Great Divide policy.

law pursuant to Fed. R. Civ. P. 50(a) and 50(b).[4]   The testimony and the policy language

establish that the policies covered "property damage" caused by an "occurrence." The policy

language, and the Court's instructions to the jury define an "occurrence" as an "accident." The

parties agree, however, that under the policy language, there is no coverage for "property

damage" caused by an "occurrence," if the damage is "expected or intended from the standpoint

of the insured." (Crowdis Testimony, ECF #103).

Westchester claims that there was no "occurrence" or "property damage" as a matter of

law.  It also contends that even if the alleged "occurrence" and "property damage" could have

triggered coverage as a matter of law, IMG failed to produce sufficient evidence at trial to prove

that an "occurrence" caused the alleged "property damage," in fact.  Plaintiffs oppose

Westchester's motion maintaining that there was a sufficient legal and factual basis upon which

the jury could, and did find in favor of IMG on their breach of contract claim.

Fed. R. Civ. P. 50(a) states in relevant part:

> If a party has been fully heard on an issue during a jury trial and
> the court finds that a reasonable jury would not have a legally
> sufficient evidentiary basis to find for the party on that issue, the
> court may:
>
>> (A) resolve the issue against the party; and
>> (B) grant a motion for judgment as a matter of law against
>> the party on a claim or defense . . .

Fed. R. Civ. P. 50(b) provides that if a court does not grant a motion for judgment as a matter

of law made after the close of all the evidence and the party renews its request after a verdict is

---

[4]

Defendant moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) at the
close of Plaintiffs' case and renewed the motion at the close of all evidence.  The Court
reserved ruling on the motion at that time.

returned, the court may (1) allow the judgment to stand, (2) order a new trial, or (3) direct entry of judgment as a matter of law.  The "standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion." Wright & Miller, *Federal Practice and Procedure*: Civil 2d § 2537, p. 347 (footnote omitted).

A court should grant a motion under Fed. R. Civ. P. 50 only if "there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ."  *Watts v. United Parcel Serv*., 378 F.App'x 520, 525 (6th Cir. 2010).   On a Rule 50 motion, a court must "review all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence."  *Id*. at 524; *see also K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175-76 (6th Cir. 1996).

A.  "Occurrence"

In order for there to have been coverage in this case, the jury had to find that there was an "occurrence," as defined by the policies.  The policies define "occurrence" as "an accident." (ECF #33-3 at 22; #33-2 at 44).  The jury instructions defined an "accident" as "an event that is unexpected, unintended and fortuitous." (Jury Instructions, ECF #128 at 407).[5]

The parties not only disagree on whether there was an "occurrence," as defined by the policies,  they also disagree on what the "occurrence" is alleged to have been.  The trial testimony of Amanda Crowdis, the claims adjuster for Westchester in the IMG matter,

---

[5]

The jury instructions state: "Occurrence is defined in the Westchester policies.  An 'accident' is an event that is unexpected, unintended, and fortuitous. . . and fortuitous means happening by chance."

indicated that based on the allegations in the *Gastaldi* complaint and the scope of the settlement for which IMG sought indemnification, the only potential "occurrence" was IMG's alleged misrepresentation that it was in a partnership with Cay Clubs, one of the project's developers. (Crowdis Testimony, ECF #103 at 63).  On the other hand, IMG defined the "occurrence" as "the real estate market downturn that apparently rendered the real estate project not feasible and Cay Clubs' and the Sunvest Defendants' inability or unwillingness to proceed with the project as a result."  (IMG Trial Ex. 28, p. 28-6; Trial Transcript, ECF #128 at 327; see also Crowdis Testimony, ECF #103 at 58).  Both parties have held steadfast to their own perception of what constituted the "occurrence"during all pre-trial, trial, and post-trial arguments.

### 1.  Misrepresentations

Westchester has argued, correctly,  that if the alleged  "occurrence" was IMG's knowing and intentional misrepresentation that it was in partnership with Cay Clubs, there would be no coverage under the policy.  A knowing and intentional misrepresentation is not an accident as defined by the jury instructions, because "knowing and intentional" behavior is neither unexpected nor unintended.  Ohio courts have recognized this premise, finding that knowing and intentional misrepresentations do not constitute an "accident."  *See, e.g,* *Cincinnati Ins. Co. v. Anders*, 99 Ohio St.3d 156, 789 N.E.2d 1094 (2003).  Following Ohio law, this district has further held that even a negligent misrepresentation does not constitute an "accident" for purposes of insurance coverage.  *See, e.g., Valley Ford Truck, Inc. v Phoenix Ins. Co.*, 813 F.Supp.2d 859, 864 (N.D. Ohio 2011).

The only claim that remained against IMG at the time of it's settlement with the *Gastaldi* Plaintiffs was a claim for deceptive representations under FDUTPA.  (ECF #32-2).

-8-

The parties agree that if the jury based its finding of an "occurrence" on the misrepresentations allegedly made by IMG, the verdict could not be reconciled with the legal instructions provided to the jury in this case.[6]  The jury instructions specifically stated that if the jury found "IMG or IMGA made a misrepresentation to the *Gastaldi* Plaintiffs in the marketing or promoting of the Cay Clubs real estate project," and this misrepresentation "caused the alleged loss," there would be "no occurrence or accident under the Westchester policies."   Therefore, the jury's finding of an "occurrence" could not have been based on these alleged misrepresentations.

Nonetheless, the jury did find by a preponderance of the evidence that there was an "occurrence" that triggered coverage under the policies.  (Trial Transcript, ECF #128 at 407).  A trial court is required to reconcile the answers a jury gives to interrogatories with the applicable law if possible under any view of the evidence presented in the case.  *Waggoner v. Mosti*, 792 F.2d 595, 596-97 (6th Cir. 1986).  As there was evidence presented of other events that could have constituted an "occurrence" in the mind of the jurors, the court is bound to presume that the jurors did follow the jury instructions provided, and that they found the "occurrence" that caused the loss in this case was something other than the misrepresentation(s) alleged by the *Gastaldi* Plaintiffs.

2. Downturn in the Economy

Westchester contends that the only other "occurrence" that could have been considered by the jury was a downturn in the economy coinciding with a collapse of the Florida real estate market.   IMG has consistently espoused the theory that the loss sought to be covered was

---

[6]

  IMG has argued, however, that a misrepresentation under FDUTPA could be an "accident" under Ohio law, and that the provided jury instruction was incorrect.

caused by a series of events starting with a downturn in the economy.  They have also argued that this economic downturn was unexpected and unintended by IMG, and that it, therefore, fits the definition of an "accident," as contemplated by the Westchester policies.  IMG further argued that the downturn in the economy caused the project to become infeasible,  which caused the developers, Cay Clubs and Sunvest, to be unable or unwilling to continue the project.  Consequently, the purchased properties became essentially worthless, causing the investors to suffer a loss of use of their property.   Westchester argues, however, that IMG did not present any actual evidence that would support this chain of causation.  Further, Westchester contends that the downturn in the economy is not an accident or "occurrence" as contemplated by the policies, and that holding otherwise could have devastating effects on the entire insurance industry.

Westchester is correct that IMG did not present any actual evidence at trial showing there was an economic collapse during the policy periods or that any such collapse was the reason the developer's failed to complete the *Gastaldi* project.  Further, there was nothing in the record of the underlying *Gastaldi* case that would indicate the *Gastaldi* court had made a determination that the economic downturn was directly connected to the abandonment of the *Gastaldi* project.[7]  Therefore, IMG has presented no evidence to support its theory that an economic downturn was the actual "occurrence" that caused the *Gastaldi* Plaintiffs' alleged losses.

---

[7] The *Gastaldi* court did appear to accept that Florida suffered from a collapse in the real estate market, as indicated in its opinion on a motion *in limine* regarding the admissibility of expert testimony.  However, the court disallowed the expert testimony that could have established this fact, and the court made no direct correlation between the presumed collapse and the abandonment of the *Gastaldi* project.  (ECF #32-7).

-10-

Westchester also argues that a downturn in the economy cannot, as a matter of law, be the "occurrence" that triggered coverage under the Westchester policy.  IMG seeks coverage of the amounts it paid to settle the claims brought against it by the *Gastaldi* Plaintiffs.  The settlement amount represents compensation for damages that could have been caused by IMG's actions as alleged in the *Gastaldi* Second Amended Complaint.  The *Gastaldi* court, however, had determined before the settlement occurred that IMG was not liable for any damages resulting from a downturn in the economy.[8]   (ECF #32-7; #140 at 17).  Even IMG, in an argument that seems contradictory to its ultimate and persistent position that a downturn in the economy was the accident or occurrence triggering the loss at issue,[9] admits that the settlement, for which it now seeks coverage, was not paid to address damages arising from the real estate collapse, and that such a position is "totally wrong and unsupportable."  (ECF #140).   Based on these arguments and admissions, and the holding of the *Gastaldi* court that disallowed any evidence of damages attributable to the downturn in the real estate market, Westchester's

---

[8]

  Westchester also argued in its Reply brief that the contract limited coverage to "those sums in excess of the 'retained limit' which the '[I]nsured' by reason of liability imposed by law ...shall become legally obligated to pay as damages for ... Property Damage ... arising out of an 'Occurrence'." (ECF #144).   This contract language, however, was contained in the 2005/2006 and 2006/2007 policies and is not found in the 2007/2008 policy. (ECF #8-3, 33-2, 33-3).   If the "occurrence" at issue was the downturn in the economy, the 2005/2006 policy would not have been the applicable policy as the economic downturn was argued to have occurred during 2007.  There is no evidence before the Court that would allow it to determine whether the alleged downturn in the economy occurred during the 2006/2007 policy or the 2007/2008 policy.

[9]

  IMG argued this was the "occurrence" in its pre-trial motions, closing arguments at trial, post-trial briefings, and again, unequivocally, upon direct query by the Court during oral arguments on post-trial motions.  The Court asked IMG if their premise is "that it was the market forces that was the occurrence, and that that's compensable."  IMG responded: "Absolutely."

argument that the economic downturn cannot, as a matter of law, be the "occurrence" that triggers coverage under the policy is well taken.

### 3.  Other Events Satisfying the Definition of "Occurrence"

If the alleged misrepresentation(s), and the downturn in the economy were the only possible events that could constitute an "occurrence" under the policy, based on the evidence presented at trial, the Court would have no choice but to grant the Defendant's motion under Fed. R. Civ. P. 50.  However, the evidence presented at trial supports another event that could have served as the "occurrence" or accident that triggered coverage in the jurors' minds.  As stated above, trial courts may not overturn a jury's verdict unless there is no view of the evidence that would support their decision consistent with the court's instructions.   Courts "must attempt to reconcile the jury's findings, by exegesis if necessary, before we are free to disregard the jury's special verdict. . . ."  *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 199 (1963);  *c.f. United States v. Alpine Industries, Inc.,* 352 F.3d 1017, 1026 (6th Cir. 2003).

In this case, IMG argued during trial that the "occurrence" was the downturn in the economy which through a series of consequences led the developers to abandon the project. As set forth above, the causal connection between the alleged downturn in the economy and the abandonment of the project was unproven at trial, and damages arising from the downturn in the economy were barred from recovery in the *Gastaldi* case.  However, the end result of the string of events argued by IMG,  the actual abandonment of the project by the developers, has not been questioned and could have been the basis of the jury's determination that there was an "occurrence" under the policy.

There was evidence presented at trial, as well as a determination by the *Gastaldi* court,

-12-

that the developers abandoned the *Gastaldi* project in the fall of 2007.  Cay Clubs, the primary

developer abandoned the project around October of 2007.  The remaining developers had

discussions to determine whether they or IMG were willing to put up the money to complete

the project, but none of the remaining parties were either willing or able to do so.  The project

was "officially" terminated by November of 2007.  (ECF #32-2, at 41).

Further the *Gastaldi* court found that the damages sought by the *Gastaldi* Plaintiffs

were based on losses related to IMG's alleged misrepresentation that it was in partnership with

the developers.  The court held that if IMG's representations had been true, it was possible that

they would have stepped up to add financial backing to the project when Cay Clubs abandoned

the project.  The court reasoned that if IMG really had been in partnership with the developers

it might have been more willing to add funds to the development when Cay Clubs went under,

and this could potentially have resulted in a continuation of the project by Sunvest and/or IMG,

itself.  (ECF #32-7).  Thus, IMG's failure to provide financial backing when Cay Clubs

abandoned the project, even though it had no contractual duty to do so, and the consequential

abandonment of the project by the remaining developers, was the theoretical basis for IMG's

financial liability under the FDUTPA cause of action.

As such, the jury could have found that the abandonment of the project was the cause of

the alleged "property damage" by the Gastaldi Plaintiffs.  The jurors could also have

determined that, under the *Gastaldi* courts prior holdings, IMG was potentially liable for these

damages and that this potential liability was resolved by the *Gastaldi* settlement.  Finally, there

was no evidence presented at this trial, nor any indication in the opinions of the *Gastaldi* court,

that the developers' abandonment of the project, even in the absence of any financial

-13-

investment by IMG, was anything other than an unintended and unexpected event from IMG's perspective.[10]

Therefore, based on the evidence and arguments presented at trial, as well as the case history provided to the jury, the jury could have easily found that the developers' abandonment of the project was the "occurrence" that caused the *Gastaldi* Plaintiffs' loss, and triggered coverage under the Westchester policy.  Further, the developers' abandonment of the project is the only identifiable event proven at trial that could fit the policy definition of "occurrence" and reconcile with the legal instructions provided to the jury at trial.  Westchester's motion for directed verdict, or judgment not withstanding the verdict based on the lack of an "occurrence" must, therefore, be denied because: (1) there was at least some evidence upon which the jury could find that the abandonment of the project by the developers caused the alleged loss to the *Gastald*i Plaintiffs; (2) there was sufficient evidence to show that, from IMG's perspective, this event was an "accident" as defined by the jury instructions, and therefore an "occurrence" as defined by the Westchester policy language; and, (3) this conclusion is consistent with all of the jury instructions provided by the Court.

B.  "Property Damage"

Westchester also contends that the jury could not reasonably have concluded that there was "property damage" as defined by the policies and that a directed verdict or judgment not

---

[10]

IMG elicited testimony showing that Westchester understood the *Gastaldi* court had found that IMG "acted in good faith regarding its obligations to th[e] project," and that "IMG believed the project would be a success."  (Crowdis Testimony, ECF #103 at 64).  This evidence was sufficient to support the jury's finding that the abandonment of the project was an accident from IMG's perspective, and that the expected or intended injury exclusion did not apply.

withstanding the verdict is warranted on this basis.  Coverage in this case was for indemnification of losses associated with "property damage" as that term was defined in the policies.  One of the definitions of "property damage" under the policies is "[l]oss of use of tangible property that is not physically injured."  The policies also state that loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.  (ECF #33-3 at 23; #33-2 at 45).  The Court gave a jury instruction stating that "property damage" is defined in the Westchester policies, and that it "includes 'loss of use of tangible property that is not physically injured.'" (Jury Instructions, ECF #128 at 272).

Before trial, both parties moved for summary judgment.  Westchester's motion made virtually the same arguments that are asserted in the pending motion regarding the element of "property damage." The Court denied Defendant's summary judgment motion as to the coverage and defense issue after finding that there were genuine factual issues that could only be resolved by a finder of fact.  The Court determined at that time that there was some evidence to support both parties' positions. Westchester's motion for reconsideration was also denied with the further finding that the Westchester policies contained latent ambiguities as they would be applied to the facts at issue in this case. As such, it was left to the jury to determine whether there was "property damage" as defined by the Westchester policies.

At trial both parties submitted evidence and presented arguments addressing whether the *Gastaldi* Plaintiffs suffered "property damage" as defined by the policies.  Westchester articulated all of the reasons presented in the pending motion to the jury in support of its assertion that there was no "property damage" compensable under the policy.  The Court gave nearly all of the jury instructions requested by Westchester with little or no change to the

-15-

language Westchester submitted. Further, special interrogatories, requested and approved by

Westchester, were submitted to the jury on the core insurance coverage issues.  The jury

answered the special interrogatory on whether IMG had proven "property damage" in favor of

IMG.

      The Court finds that there was sufficient evidence presented at trial to support the jury's

finding of "property damage" based on a loss of use of tangible property under the Westchester

policies.   Westchester's claim representative, Ms. Crowdis, testified that the units would be

considered "tangible property" under the policies, and that it was "not unreasonable for IMG to

read [the *Gastaldi* allegations] as alleging 'property damage." (Crowdis Testimony, ECF #126

at 96, 129).   Further, Westchester did not dispute that the condominium units in their

undeveloped state were "in deplorable condition" and could not be rented, "or not in a

meaningful way."  (ECF #128 at 369).  In addition, Ms. Crowdis testified that the *Gastaldi*

complaint sought damages including the "difference between the value of the units that were

delivered to them and the value of the units as they should have been delivered."  (Crowdis

Testimony, ECF #127 at 180).

      The jury could and did reasonably disagree with Westchester's argument that any loss

suffered by the Gastaldi plaintiffs was purely economic loss sought to compensate a diminished

return on investment, and was therefore, not covered by the policy.  The damages alleged in the

*Gastaldi* Second Amended Complaint, and addressed by the settlement in that case, could

properly have been viewed as damages stemming from a loss of use of tangible property.  The

damages recoverable under FDUTPA are not compensation for a loss on investment, but rather

seek to compensate a buyer for the difference between the value of the product they thought

-16-

they had purchased and the actual value of that product at the time of purchase.  Although the damages request in the Second Amended Complaint also presented a calculation that could resemble a loss of investment approach, no determination was made as to what the exact damages were, or how they should be calculated because the case was settled before trial. Certainly, under the FDUTPA allegations either a partial or entire refund of the purchase price of the properties, or a loss of the rental value expected from renovated units could be possible measures of the damages in the *Gastaldi* case, which would be consistent with the types of damages awarded in "loss of use" cases.

The fact that the damages sought could be considered to be "economic damages" also fails to preclude coverage under the Westchester policies.  Because the policies include coverage for loss of use of tangible property, and do not require an actual injury to the property at issue, economic damages are contemplated under the coverage language. *See, Hartzell Industries, Inc. v. Federal Insurance Co.*, 168 F.Supp.2d 789, 796 (S.D. Ohio 2001)("the Court cannot conceive of damages for the loss of use of tangible property that is not physically injured being anything other than 'purely economic losses.'").  Therefore, having carefully reviewed all of the briefing submitted by the parties, as well as all of the evidence presented at trial, the Court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find that the Gastaldi Plaintiffs suffered "property damage" as defined in the Westchester policies.  The Defendant's Motion for Judgment as a Matter of Law Pursuant to FRCP 50(a) or for JNOV Pursuant to FRCP 50(b) is, therefore, denied.


II.  Duty to Defend

A.  The Applicable Policy

The duty to defend language in the 2005/2006 and 2006/2007 policies is substantively different than the language contained in the 2007/2008 and 2008/2009 policies.[11]  Therefore, in order to decide the question of Westchester's duty to defend, this Court must determine which policy provides coverage in this case.  The parties have both been woefully inconsistent in their arguments on this issue, and have seemed determined to avoid addressing the actual policy language when making their respective arguments.

IMG originally tendered its request for coverage under the 2008/2009 policy.  (Crowdis Testimony, ECF #104 at 11). It settled with Great Divide under the 2005/2006 policy.  In its motion *in limine* seeking admission of the settlement with Great Divide, IMG argued in part that admission of the agreement was necessary to show that the date of the "occurrence" triggering coverage was within the 2005/2006 policy year.  (ECF #71).  However, at trial IMG refused to accept Westchester's stipulation that the 2005/2006 policy applied.  During trial and post-trial arguments, IMG argued primarily that the 2007/2008 policy was the easiest path to coverage, even though it continued to insist that the "occurrence" triggering coverage was IMG's misrepresentation of partnership, a series of events that occurred in 2006 and early

---

[11]

 The language in the 2005/2006 and 2006/2007 policies provides Westchester with an easier argument in support its position that Westchester is not liable for defense costs, as there is no direct language requiring "drop down" coverage when a primary insurer refuses to provide defense coverage.  In fact, there is a specific disclaimer of liability for defense coverage when the primary improperly denies coverage.  The relevant language states: "We will not be obligated to ... defend any "Claim", "Suit" or trial . . . when . . . the 'Underlying Insurance' is not available or collectible because of . . . failure to comply with any of its policy obligations of the underlying insurer(s)...."

2007.[12] (ECF #83).  Despite these arguments, IMG also introduced evidence of the 2005/2006, 2006/2007, and 2008/2009 policies at trial, (Crowdis Testimony, ECF #103), and has since refused to commit to any single policy year.  At trial and in post-trial briefings and argument, IMG left open the possibility that any one of the policy years could have been applied to the coverage of the *Gastaldi* claims.

Westchester has been no more direct.  Westchester's original denial of claims was based on a review of the 2008/2009 policy.  Following this denial, IMG asked for a review of all four policies, and Westchester reviewed each of the four policies and again denied IMG's claim for coverage.  When the trial began Westchester offered to stipulate that coverage, if available at all, would have been available under the 2005/2006 policy.   In its post-trial motions, Westchester also sites to language from the 2005/2006 policies while simultaneously arguing that the "occurrence" that led to coverage was an event that began in 2007.

As the parties seem unable or unwilling to determine which policy applies in this case, the Court has turned to the language within the policies to make that determination.  Under the 2005-2006 and the 2006-2007 policies coverage is triggered by property damage "arising out of

---

[12]

According to the District Court's summary judgment opinion in the *Gastaldi* case, IMG participated in the marketing of the project in 2006 and 2007.  (ECF #32-2, at 4).  In March of 2006 sales associates for the properties were notified that IMG and the developers were completing a joint venture, and the developers made public statements about a joint venture with IMG.  (ECF #32-2, at 10).  IMG was aware of these representations, and created some of the language used in marketing materials that described IMG and the developers as being in "partnership."  (ECF #32-2, at 10).   In March 2007 IMG created some materials that described a collaborative relationship with the developed and referenced that it expected to influence sports–training offerings at future developments, including the one at issue in this case.  (ECF #32-2, at 7).  Between March and June 2007 a version of these materials was posted to IMG's website.  (ECF #32-2, at 7).

-19-

an occurrence during the policy period." (ECF #8-2, 8-3).  Under the 2007-2008 policy,

coverage is triggered by an "occurrence" that takes place in the coverage territory, resulting in

"property damage" that "occurs during the policy period."  The "property damage" alleged and

proven at trial was the *Gastaldi* Plaintiffs' loss of use of the property, which they claimed was

rendered valueless by the developers' failure to renovate the property.  Under all four policies

"property loss" arising from loss of use is deemed to have occurred "at the time of the

'occurrence' that caused it."  (ECF #8-2 through8-5).  The Court has determined  that the

jury's finding of an "occurrence" must have been based on the abandonment of the *Gastaldi*

development project, which happened in the fall of 2007.  Therefore, the 2007/2008 policy,

which was in effect in the fall of 2007 when the project was abandoned, is the policy that shall

be applied in determining whether Westchester is liable for reimbursement of IMG's defense

costs in the *Gastald*i action.

### B.  Duty to Defend Under the 2007-2008 Policy

The 2007/2008 policy provides that Westchester

> will have the right and duty to defend the insured against any "suit" seeking
> damages for ... "property damage" when the "underlying insurance" does not
> provide coverage or the limits of "underlying insurance" have been exhausted.

(ECF #33-3 at 9).  This duty is limited, however, by restrictions outlined in the "Other

Insurance" section of the policy.  In that section the policy confirms that Westchester's

insurance is "excess over, and shall not contribute with any of the other insurance ...."  In

addition, the policy specifically states that

> [w]hen this insurance is excess, we will have no duty ... to defend the insured
> against any "suit" if any other insurer has a duty to defend the insured against
> that "suit."  If no other insurer defends, we will undertake to do so, but we will

-20-

be entitled to the insured's rights against all those other insurers.

(ECF #33-3 at 19).

Based on the language of this policy, there are two independent reasons why Westchester is not liable for reimbursement of defense costs related to the *Gastaldi* action. First, Westchester's promise to undertake defense of the *Gastaldi* action expired when Great Divide provided coverage for indemnification and certain defense costs following its settlement with IMG. Second, Westchester' s promise to provide coverage in the event another insurer fails to defend was conditioned on its retention of subrogation rights allowing it to recover those costs from the other insurer. IMG, by releasing Great Divide from any further liability for defense costs in their settlement agreement, eliminated Westchester's subrogation rights and violated one of the conditions required for Westchester's "drop down" coverage.

Great Divide, the primary insurer in this case, was originally asked to cover the defense costs and any liability arising in the *Gastaldi* action. Great Divide refused coverage throughout the underlying litigation and settlement process and did not contribute any money towards indemnification or defense costs until it settled with IMG in September of 2010. (ECF #147 at 7). Through that settlement, Great Divide agreed to pay one million, two hundred and fifty thousand dollars ($1,250,000.00), exhausting the one million dollar "Each Occurrence" sub-limit set forth in the 2005/2006 policy for "property damage" caused by an "occurrence," and settling all liability for defense costs associated with the *Gastaldi* action. (ECF #146 -2). In exchange, IMG released Great Divide from "any and all Claims based upon or arising out of (1) the *Gastaldi* Action, and (2) the Releasees' handling of the company's claims for insurance coverage based upon the *Gastaldi* Action." (ECF #146-2 at 3). The Agreement included a

-21-

release from any obligation or liability to indemnify or defend, and covered Claims that could have arisen under any of the Great Divide policies. (ECF #146-2 at 2,3).  Further, although Great Divide did not admit liability in the Settlement Agreement, the Agreement did acknowledge that the *Gastaldi* settlement included "payment of sums that IMGA became legally obligated to pay," and that the Agreement exhausted the Great Divide policy "due to a payment for 'property damage' caused by an 'occurrence' under the Policy." (ECF #146-2 at 1, 3).

IMG has repeatedly argued to this Court that the Great Divide settlement constituted a coverage determination by Great Divide and that Great Divide, through the settlement, acknowledged coverage of the *Gastaldi* settlement costs.  (ECF #28-1 at 22-23; ECF #40 at 14, 17; ECF #71 at 1-4; ECF #76 at 9-10). [13]  IMG has also pointed the Court to the deposition testimony of Great Divide's assistant secretary, wherein he stated that Great Divide, through the Settlement Agreement, agreed there was "property damage" caused by an "occurrence"

---

[13]

  The parties took contradictory positions in their motions *in limine* with regard to the admissibility and meaning of the settlement agreement between IMG and Great Divide. At the trial on indemnity, IMG sought to introduce the settlement agreement as evidence that Great Divide acknowledged its coverage obligation to defend and indemnify for the property damage at issue in the *Gastaldi* action.  This position undercuts IMG's ability to prove that Westchester owed a duty to defend under its excess policy, because if Great Divide was liable for defense costs, its contract with IMG makes it clear that it is to pay all defense costs incurred prior to the point in time when it "used up the applicable limit of insurance in the payment of judgments or settlements." (ECF #33-1 at 43).  In this case, that would equate to all of the defense costs incurred.  Further, the Great Divide contract makes clear that as the primary carrier, its "obligations are not affected [by the existence of other policies] unless any other insurance is also primary." (ECF #33-1 at 16).  On the other hand, Westchester, who now argues that Great Divide's settlement constituted coverage of the *Gastaldi* claims and triggered Great Divide's full duty to defend, argued against the admission of the settlement agreement at the trial on indemnity, and contended that the settlement did not acknowledge any coverage obligation or any duty to pay IMG's defense costs.

under the Great Divide policy.  (ECF #40 at 14; Apx. Ex. X at 69).  Further, IMG has cited *Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F. Supp. 2d 483, 499-500 (N.D. Ohio 2006) for the proposition that an insurer/insured's agreement that policy limits were exhausted is presumptive evidence, if not conclusive evidence, that there was coverage under the settled policy.

A Court may take a settlement agreement with a third party primary insurer into account when determining how to calculate the amount of damages remaining and the amount of coverage owed by an excess carrier, after the excess insurer has been found liable for indemnity on the available admissible evidence.  *See Hooters of Augusta v. American Global Ins. Co.,* 272 F.Supp. 2d 1365 (S.D. Ga. 2003), aff'd 157 F.App'x 201 (11th Cir. 2005); *see also, Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F.Supp.2d 483, on reconsideration, 239 F.R.D. 479 (N.D. Ohio 2006)        Accepting that the Great Divide Settlement is evidence of an acceptance of coverage under the Great Divide policy, the Court must look to what obligations existed under the Great Divide policy.

The IMG/Great Divide Settlement paid the maximum occurrence limits of one million dollars ($1,000,000.00) for indemnity, which everyone agrees is the policy limit.  However, Great Divide paid out only two hundred and fifty thousand dollars ($250,000.00) in defense costs.  Under its policy, Great Divide had the contractual duty to defend IMG until "we have used up the applicable limit of insurance in the payment of judgments or settlements." Because, Great Divide did not use up the applicable limits of the policy until at least September of 2011, when the settlement was executed and presumably paid, and because all of the defense costs associated with the *Gastaldi* action were incurred prior September of 2011, Great Divide

had the duty to cover all of IMG's defense costs at the time of the settlement.

Westchester's policy provides that it has "no duty ... to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit."  Therefore, pursuant to this provision, Westchester had no duty to defend because Great Divide had the duty under its own contract terms to provide coverage for the full amount of defense costs associated with the *Gastaldi* action.  (ECF #33-3 at 19).[14]  IMG, however, argues that Westchester has a duty to pay the remaining defense costs, under a separate but related clause providing that Westchester would provide "drop down" defense coverage if no other insurer steps in to defend.  As part of this provision, Westchester promises that "[i]f no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers."  (*Id.*).

The promise contained in this clause, however, does not create an acceptance of the ultimate responsibility for defense coverage by Westchester in the event of a dispute with the primary carrier.  Rather, it is dependent on the fulfillment of two conditions: (1) that no other insurer defends, and (2) that Westchester maintains subrogation rights against the primary

---

[14]

Had Great Divide paid its liability limits before the end of the *Gastaldi* lawsuit, and additional defense costs had been incurred after that payment, these would have been the primary responsibility of the excess carrier, Westchester.   However, IMG settled with Great Divide for the policy limits and $250,000 in defense costs, after all defense costs in the *Gastaldi* lawsuit had already been incurred.  Therefore, Great Divide's duty to defend and/or to cover the cost of defense did not expire until the settlement was finalized. There were, therefore, no additional defense costs incurred that were the primary responsibility of Westchester, the excess carrier.

insurer.[15]  At the inception of the *Gastaldi* lawsuit, both carriers claimed that there was no coverage under their policies.  Great Divide later released its defense of no coverage and settled for its policy limits, and a portion of the defense costs.  At this point, upon releasing any defense to coverage, and actually providing coverage up to their full policy limits, they became obligated to pay the full amount of defense costs under the terms of their policy.  Further, by paying some amount of the defense costs, Great Divide undertook to cover defense costs, albeit in a negotiated discounted amount.  Therefore, by the time IMG brought suit against Westchester, Great Divide had provided defense coverage.  Therefore, the "no other insurer defends" condition in the Westchester policy was no longer met, and Westchester was no longer obligated to "drop down" to provide coverage.  Thus, once IMG settled with Great Divide, any duty Westchester may have had to provide "drop down" defense coverage effectively expired.[16]

In addition, by the time IMG filed suit against Westchester it had violated the second

---

[15]

In retrospect, based on the jury's ultimate decision in this case, at the time Great Divide refused to provide coverage, Westchester probably should have stepped up and provided that coverage until a determination of Great Divide's liability could be made.  However, Westchester also contested coverage under its policy and made a reasonable, good faith, decision not to provide coverage under the policy.

[16]

The Court makes no determination as to whether a delay in providing "drop down" coverage by an excess carrier who denies coverage could ever lead to liability following a settlement on defense costs with the primary insurer.  However, in this case, the Court has made a finding that Westchester's original position denying coverage was reasonable, and made in good faith.  In addition, IMG did not file suit against Westchester until after it had settled with Great Divide, including a settlement on defense costs. Further, IMG has provided no evidence that the delay in recovery caused by Westchester's failure to provide defense coverage upon first request caused any monetary loss over and above the actual defense costs incurred.

-25-

condition required for "drop down" defense coverage.  Under the 2007/2008 Contract,

Westchester's promise to provide "drop down" defense coverage was explicitly conditioned on

a right of subrogation that would have allowed Westchester to recover those costs, in full, from

Great Divide if coverage under the Great Divide policy was later established.[17]     There is no

dispute that the IMG/Great Divide Settlement released Great Divide from all further liability to

IMG for defense costs arising from the *Gastaldi* lawsuit. (ECF #146).   This extinguished any

further right IMG may have had to defense costs attributable to Great Divide.  However,

because an insurer's rights as a subrogee are derivative of the insured's rights and cannot

extend further than the rights of the insured, by releasing those rights on its own behalf, it also

released any subrogation rights Westchester would have had to recover defense costs on IMG's

behalf.  *See, Warmack v. Arnold*, 961 N.E.2d 1165, 1168 (Ohio 1st Dist. 2011).  Therefore,

IMG's release of Great Divide precluded satisfaction of the second condition for Westchester's

"drop down" coverage of defense costs.  *See, One Beacon America Ins. Co. v. American*

*Motorist Ins. Co.*, 679 F.3d 456 (6th Cir. 2012).

IMG has implied that Westchester could still recover defense costs from Great Divide

under various equitable principles if it were found liable under the "drop down" provision in its

contract.  Some courts applying Ohio law, however, have limited an excess carriers ability to

seek contribution or other equitable remedies from a primary carrier after it has settled with the

insured.  These cases cite the importance of promoting and protecting the finality of settlements

---

[17]

 "If no other insurer defends, we will undertake to do so, but we will be entitled to the
insured's rights against all those other insurers."  (ECF #33-3 at 19).

and place that value above the equitable contribution rights of an excess carrier.[18]  *See, One Beacon America Ins. Co. v. American Motorist Ins. Co.*, 679 F.3d 456 (6th Cir. 2012); *Bondex Int'l Inc. v. Hartford Acc. And Indemn. Co.*, 2007 WL 405938, *5 (N.D. Ohio, Feb. 1, 2007); *GenCorp, Inc. V. AIU Ins. Co.*, 297 F. Supp. 2d 995, 1007 (N.D. Ohio 2003), aff'd 138 Fed. Appx. 732 (6th Cir. 2005).

The courts in the above cases also make it clear that the insured may not shift the risk of settling for a reduced amount with the primary carrier to the excess carrier.  *See, Id.*  It was IMG who accepted the risk of obtaining a reduced recovery for defense costs from Great Divide through settlement, rather than choosing to go to trial to obtain the full amount of defense costs.  IMG cannot pass that risk onto Westchester by requiring it provide "drop down" coverage even after Great Divide, who had primary liability for all defense costs,  has paid its policy limits on coverage and settled for a minuscule portion of the defense costs.  This is especially true when IMG has destroyed Westchester's ability to seek reimbursement or contribution from Great Divide by eliminating any subrogation rights Westchester should have maintained under the terms of its contract with IMG.

In short, Westchester owed no duty to provide defense costs because Great Divide was the primary carrier and as such, was liable for all defense costs incurred up until it had exhausted its policy limits.  In this case, all defense costs were incurred before the Great Divide

---

[18]  Even if equitable contribution or subrogation were allowed, IMG may have skewed the equities of the situation by attesting in the Settlement Agreement with Great Divide that no right of recovery belonged to any other entity in connection with the matter.  If IMG had intended to seek defense costs from Westchester on the premise that Westchester had rights against Great Divide, as it has argued here, this statement would have been knowingly false at the time it was made.  As between Great Divide and IMG, IMG should bear the consequences of that misrepresentation.

policy was exhausted, therefore, Westchester's duty to provide defense costs was never triggered.  Further, by the time IMG filed suit against Westchester neither of two conditions required for "drop down" coverage existed.  Through the IMG/Great Divide Settlement, Great Divide covered defense costs and Westchester's subrogation rights had been released.   Both of these events precluded IMG from satisfying the conditions required for Westchester to provide "drop down" coverage under the policy terms.  Further, the Settlement with Great Divide was a compromise in which IMG accepted the risk of accepting less than they were owed.  That risk was undertaken by IMG and cannot be transferred to Westchester.  Therefore, Westchester owes no duty under the 2007/2008 policy to cover the remainder of IMG's defense costs from the *Gastaldi* action.

As the Court finds that Westchester is not liable for defense costs in this case, Defendant's Motion for Leave to File a Third-Party Complaint Against Great Divide (ECF #112) and Defendant's Motion for Declaratory Judgment with Respect to Reimbursement from Great Divide or in the Alternative a Set-off Based on the Settlement Agreement Between Great Divide and IMG (ECF #136) are both denied as moot.


III.  Pre-Judgment Interest

Pursuant to O.R.C. § 1343.03, IMG is entitled to pre-judgment interest, calculated at the rates established by O.R.C. § 5703.47, from the date the $3.9 million indemnity payment became due until the date of the final judgment in this case.  *Landis v. Grange Mut. Ins. Co.*, 82 Ohio St.3d 339, 341 (Ohio 1998).   Although Plaintiffs have submitted a brief addressing the amounts owed under the statutory schedules, Defendant did not submit a substantive response

to these calculations.    Defendants have until May 28th, 2013 to submit any objections they may have to the Plaintiff's calculation of pre-judgment interest.  If no response is received, the Court will award the amounts set forth in the Plaintiff's brief with regard to the indemnification payment.

IV.  <u>Conclusion</u>

For all of the reasons set forth above, The Defendant's Motion for Directed Verdict Pursuant to FRCP 50(a) or for JNOV Pursuant to FRCP 50(b), (ECF # 120) is, denied ; Plaintiff's Motion for Judgment in Favor of IMG on Westchester's Duty to Defend, (ECF #116), is denied; Defendant's Motion for Leave to File a Third-Party Complaint, (ECF #112), is denied at Moot; Defendant's Motion for Declaratory Judgment, (ECF #136), is denied as Moot; and, Plaintiff's Motion for Prejudgment Interest (ECF # 117) is granted, in part.
IT IS SO ORDERED.


  /s/Donald C. Nugent     
DONALD C. NUGENT
United States District Judge

DATED:  May 13, 2013